Downing, NJ 065012 Colvin Cattle Company v. United States Mr. Van Zandt Good morning, Your Honor. Thank you. May it please the Court, the plaintiff is sued in this case for taking of its water rights and ranching operation near Goldfield, Nevada. The water rights aren't taken, are they? Yes, the water rights have been taken. How? They've been taken by barring Colvin Cattle Company from accessing them. Well, but the rights themselves remain yours and are undisturbed by the fact that the grazing lease has gone to someone else, right? A water right is only as good as the ability to use it. Okay, but in theory you might be able to apply for some right-of-way to gain access to your water and, I don't know, truck your cattle in to get their water and truck them out so that they don't impinge on the grazing rights of someone else. But at least on the record that I've read, there's no withdrawal or taking of your water rights. Well, I think you have to look at the practical situation that we have here, which is an issue of fact, and this case was decided on a motion to dismiss. And there is a factual dispute about the practicality of being able to go and utilize those water rights. But they didn't expressly take those rights. You could get an easement, some kind of right-of-way to get access to your water. It's still your water. It's not theoretically possible that that could happen. Okay. But to evaluate the motion to dismiss in this context is the court, of course, is under a limited standard of review. And the court should be looking at, of course, the facts pleaded in the complaint and take those as true and draw reasonable inferences from those. Now, the facts leading up to the termination of Colvin's lease are in dispute, cannot be resolved in a motion to dismiss or by summary judgment. Moreover, the important question of what local law and custom was in Nevada that applied to these rights, that would define the rights confirmed to Colvin and its predecessors and interests, is a mixed question of law and fact. In fact, in a similar case that's now before the Court of Federal Claims, Walker v. United States, I didn't have a brief. Judge Braden has certified that very question to the New Mexico Supreme Court. It's pending now. It's been fully briefed—excuse me, it's not been fully briefed, but almost fully briefed. And that question is going to be answered shortly. The United States and the trial court want to limit this case to an inquiry about grazing permits. But this case really is not about grazing permits. It doesn't have anything to do with grazing permits. The real focus of the case is on stock watering rights. Water rights— But the question is the grazing permit, isn't it? I don't recall the bar to access to the water. Isn't the issue the grazing permit? There is no grazing permit here, Your Honor. It's the grazing lease, the Section 15 lease— But the fact that grazing is no longer available. The United States has terminated the lease. Yes. That's correct, and barred the Pogan Cattle Company from accessing its water rights. Because you didn't pay the fees. No, we tended to fees. Now, there was a factual dispute about how that all came about, that the trial court— The basis, if I understand from your briefs, is you say Nevada law gives you the water rights, and therefore you should get the grazing rights, which are attendant to the water rights. But how can Nevada law preempt a federal program, a federal land grant? Well, there is not a preemption. Of course, before the passage of the Tailored Grazing Act, the United States— This is federal land, right? I understand, Your Honor. Recognize that the states would regulate the grazing within those lands prior to the passage of the Tailored Grazing Act. Of course, we have in the Mining Act of 1866 that these rights are to be administered according to local law. This gets back to the whole Hage theory that the states are still in charge of the land, right? Well, the states are in charge of the water rights. And all the land is attendant to it. Not the land, but the uses. It's the uses that we're talking about here. These uses are inheritable uses. They're mortgageable. And they are real value to these rights that the ranchers rely upon. So I think what you have to look at is that in the Mining Act of 1866, with local law and custom, as defined essentially by the 1925 Stockwater Act in Nevada, that defined what the local law and custom was. That was preserved, it confirmed— Those are the reasons that you stopped paying the fees, because you thought the state really governed this land, not the federal government. Well, there's no allegations in the complaint with regard to that. This is an issue that the United States has raised. The position that we are taking in this litigation is that there was essentially actions by the government that barred us from accessing the water rights and making full use of the range for grazing of cattle. But they have the full right to give the lease to whoever they want to, right? Well, there's a preference grazing right that attaches to that lease, and that had been adjudicated to the Colvin Cattle Company and its predecessors. So under the statute, the United States is supposed to continue that lease and renew it. Unless you don't pay the fees. Did you pay the fees? We did pay the fees. We tendered the fees, and it's in the record. Well, let's even assume you tendered the fees. Why wouldn't the government be entitled to do what it wanted to with its own land? Well, the issue is if you give a lease to somebody and tell them that you can use this allotment for the raising of cattle and you already have confirmed the water rights to yourself. And then the United States puts you in a position where it makes it practically impossible to graze your cattle because they have rotated pastures around, they have imposed conditions on you that make it basically impossible for you to use the allotment. And we have, of course, the occupation of the lands by the horses and burros as well. Those essentially took over the water rights and the forage, and there was none left for the cattle. So you have a lease. You have the government saying to a party, we're going to give you a lease, we're going to let you use this allotment, we're going to withdraw these lands for the specific purpose of grazing, but we're going to allow all these incompatible uses to occur that essentially prevent you from ever putting it into productive use.  And that was the dispute that caused Mr. Coleman initially not to pay his grazing fees. He said, I can't use the land, so why should I pay you for something I can't use? They've been in negotiations, they went back and forth for a while about that, and then they decided that they would tend to the grazing fees. Well, someone else is using this, right? Mr. Johns. Mr. Johns is able to use it. But only partially. He only has about 300 head of cattle. And so it's a small part of the allotment that he is using. But again, he's supposed to truck in his own water, but there's evidence in the record that, in fact, he is using Coleman's water. So there's no dispute that Coleman owns the Forge Bar Ranch. There's no dispute that he owns the water right. So the issue, when it comes down to it, is what happens when the government says that we give you a lease, we give you this contract to enter upon these lands and graze your cattle, but we make it impossible for you to do it. I think it's important to note that the Taylor Grazing Act has that specific reservation of rights clause that basically says that nothing in the Act shall be construed or administered in any way to diminish or impair any right to the possession and use of water for agriculture or other purposes. Those words are contained in Section 315B of the Taylor Grazing Act. And also we have a savings clause in the Federal Land Policy Management Act that says something similar. Our actions by the Secretary concerned under this Act shall be subject to valid existing rights. There's a very important connection here between the water rights and the use of the Forge. The use of the water rights and the use of the Forge. If you look at the case of A.T. West, which is cited in our brief there, the Interior Department in a decision in 1938 in close proximity to when the Taylor Grazing Act was first being implemented, says that essentially if you have these rights prior to 1934, when the Taylor Grazing Act was passed, then you have what is essentially an easement created for the use. I'll tell you what I don't understand, what's troubling me. You tendered the fee to the state of Nevada. Did you also tender the fee to the federal government? We did. Yes, Your Honor, we did. The same amount? The same amount. The same sum in the alternative or two tenders? It was the same amount. Was this intended to preserve the lease, which was canceled? There was an appeal, an administrative appeal underway, and the federal government was issuing trespass notices. So the Colvin Cattle Company tendered the permit fees in order to alleviate the trespass. Tendered to who? To the United States, to the Bureau of Land Management. And what happened to the tender to the state? The tender to the state was returned to the Colvin Cattle Company. Why were there trespass notices? The trespass notices were based on the failure to pay the fees. In other words, you didn't pay, didn't pay, didn't pay, didn't pay, and then when they were going to kick you off, you finally said you'd pay. It was just one year. One year of nonpayment would bother most landowners, I would think. It would be a situation where you rented a house and the landlord won't let you use the house. Do you continue to pay your rent under that situation? You were trespassing in the house for a year, though, without paying? Is that the government's position? No, Mr. Colvin Cattle Company began removing its cattle. We're talking about over 1,000 head of cattle that were out on this range originally. There were only 50 that were on the range when the trespass notices were issued. A little trespassing is still trespassing, isn't it? I agree with that, Your Honor. Like I said, there's a factual dispute there. We did bring to the Court's attention also the Western Watersheds Project v. Matejko, a case just recently decided by the Ninth Circuit. That deals with BLM and issues with regard to rights of way under the Mining Act of 1866, which, by the way, are involved in this case, despite the statements by the United States in their brief. That case says that rights confirmed under the Mining Act are perpetual and they're based on local law and custom, and it talks about the reservation of rights and the savings clauses in the Federal Land Policy Management Act. The United States would have this Court believe that somehow Colvin can magically transfer its water rights and use it for another purpose in a different place, but as this Court has ruled in Washington County v. the United States, there is no vested right in a transfer. In fact, so long as the right remains to use water at its original place of use, there is no taking. Of course, that's exactly the situation that we have here. We are not able to use the water at its original place of use, and we have no vested right to use that water at any place else. The only value for this water is for stock water, and the rights consist of wells and springs scattered over 625,000 acres in southern Nevada. It's a factional question whether they can be used elsewhere. A water right is a user's right, and if you can't use the water right, then it has no value, and that's essentially what we have. The Nevada Courts have recognized that the use of forage and the use of water rights are inextricably linked, and that's in Ray Calvo in Cana v. Marble and in Anzalapaho v. LaGuardia. One cannot raise cattle without water, and one cannot use stock water without using forage. So Judge Lawrence Smith in the Hage case, Hage v. United States, found that implicit in a vested water right based upon putting water to beneficial use for livestock purposes was the impertinent right for those livestock to graze alongside that water. That was after he looked at a record with regard to local law and customs. That's under the Mining Act or something, isn't it? That's under the Mining Act of 1866, yes. Where is this opinion, the Hage opinion? The trial was complete two years ago, and we haven't seen a decision yet. It's still with Judge Smith. We've had actually two trials, one on the property rights itself, and there was a summary judgment that was earlier on. And this is from the property rights opinion at 51 fed claims at 580. But we're still waiting for Judge Smith to rule on the taking itself and the valuation at that trial about two years ago. Okay, Mr. Van Zandt, you're using your rebuttal time. You may do so or say what's left. All right. I did want to mention that the lease, we believe if you look at U.S. v. Certain Parcels, that case stands for the proposition that this is a lease, and it's a contract, and it's a compensable contract under the law. And I'll reserve the remainder of my time. Okay. Thank you, Mr. Van Zandt. Ms. Barton. May I please support? I plan to spend most of my time on the primary issue in this case, which is obviously the takings issue. But I would first like to note there are two other types of claims in the case. There's a breach of contract claim, and there's a claim for compensation for range improvements. In our answer in brief, we argued that in addition to these claims being properly dismissed for failure to state a claim, these claims should be dismissed, in fact, for lack of jurisdiction. And Colvin Cattle has provided no substantive response to that. We would encourage his court to dismiss those claims for lack of jurisdiction. You mean lack of jurisdiction of the court of federal claims, not for failure to state a claim, right? Yes. Yes. The breach of contract claim, we believe, was outside the time for the statute of limitations because their failure to pay the grazing fee required by the lease was in 1995 when we leased the United States from any compensatory duties under the lease. It's not a matter of jurisdiction, is it, if the statute is run? The statute of limitations under the Tucker Act. There's jurisdiction of the parties. Excuse me? There's jurisdiction of the parties. There's jurisdiction of the subject matter. Jurisdiction under the Tucker Act over the United States. It's a part of the sovereign immunity waiver under the Tucker Act. The contract claim? Excuse me? Does the Tucker Act relate to contract claims? Takings. Yes, takings and contract claims. Right. Yes. And then the other claim, the compensation for range improvements claims, is lax jurisdiction for lack of ripeness because the determination of compensation is required by the Secretary. This Court would review that determination under an arbitrary capricious standard. Otherwise, the Court would have to determine it to no avail, and that's not the practice that this Court has used, as explained in our brief. I understand we don't have Judge Smith's Hage opinion before us, but how would you square this with his ruling that within 50 feet of water, you have limited grazing rights? Well, first of all, there is no claim here to a right of way in that portion of the Hage opinion, and Judge Smith and Hage actually determined that the general claim that water rights give you a right to graze on the federal domain was incorrect under the 1866 Mining Act. Is the claim to the entire Montezuma allotment? Yes. Yes, that is their claim, that they have taken their entire right to graze on the allotment. We also think that Judge Smith is wrong. Okay. Now, this claim to—so all their claims, basically, their takings claims, rise from their claim that they own grazing rights on the property. And that claim has been made in a number of forms over the years and has been rejected consistently by the courts, including the Supreme Court, which has held that the grazing in the public lands is a sufferance of the United States. It's a revocable privilege. And although they come up with a sort of different theory here, the result is the same. The theory here is based on their water rights. If the state law gives an entitlement to certain grazing rights attendant upon the water rights, how does the federal government acknowledge that? Well, the premise of that question is we believe it's incorrect. State law does not recognize the right to a use as part of the right of the water rights. Well, let's assume for a second that it does. Maybe not this case. Let's assume that Montana expressly says that you can graze alongside your water right, whatever it may be. How would that square with BLM leasing policies? Any rights in the public domain can be controlled by the states only to the extent, under the Supremacy Clause, only to the extent that Congress has allowed the states to do so. The statute that governs here is the 1866 Mining Act. And every court that has examined the 1866 Mining Act has concluded that its recognition of state law's application to water rights extends only to the use of water and not to the use of lands. That includes the Ninth Circuit decision in Hunter v. United States and the Tenth Circuit decision in Diamond Bar, both of which addressed claims just like the claim here, which is that they had water rights and they claimed the rights to graze under the 1866 Mining Act because of those water rights. The language of the Mining Act only says what you get, what the state law applies to, is the use of water. In fact, the Supreme Court has described that as severing the water rights from other rights in the public domain. So it's clear that the Supreme Court does not view these as being bound up together, the rights in the land and the rights in the water. As a practical matter, how does Mr. Colvin protect his water rights from wild burrows or from Mr. John's cattle or from anything else if he's denied any kind of access to it? I guess there's a couple of answers to that. Or how does he use his water right to be even more express? I think it's important to look at the water right as we would as any property interest in a takings case where you determine the dimensions of the property interest by looking at the background principles that are in place at the time that the property interest is acquired. Here, Colvin Cattle obtained a water right to put a stock water right, to use water to water his cattle that were grazing on the public land at the sufferance of the United States. That's all he obtained in that water right, was the right to use the water for his cattle as long as the United States allowed them to keep the cattle on the land. It's sort of like, we cite the Conte case in our brief, which is one of the fishing boat cases this court has had, where owners of fishing boats have tried to come up and say, we can only use the boat for the fishing that you have revoked our permit for. And this court has held in Conte and similarly and even more fundamentally in American Pelagic that when you have something that you can use only with a revocable interest given by the United States, you don't have any expectation in that continued use. And that's the same thing. So you really have taken the water too? We have taken their ability to use their water for stock water at that location. Whether there is other use that could be made of it, I mean they have disavowed that and we made a ripeness claim below. Why couldn't they apply for a right-of-way to truck their cattle in to be watered? They could apply. I don't know what the result would be. They certainly could apply. And we argued below, actually, that the claim was not right. But Judge Reese said, well, their claim is only that they can't use their water for stock here. That's all they claim that they can do. And so we have limited our argument and appeals just to that discussion. Now I'd just like to point out their concern that there are issues of fact that were improperly addressed by the district, by the trial court, or that matter here are just incorrect. I mean Judge Reese's decision is based completely on matters of law and matters that are within the scope of the plaintiff's complaint. So you don't need to get to the question of what Nevada state law is because federal law does not allow Nevada state law to apply with respect to the public lands. But even if you did, they've only maintained that it's the Nevada Stock Water Act of 1925 that provides the state law that's relevant here, and that's just a matter of statutory interpretation. And as Judge Reese correctly found, that statute is only an exercise of regulatory police powers by the state. And the state—sorry, I'm talking too fast. The state Supreme Court three times has held that it had no ability to give any rights in the public lands. There's three Supreme Court cases—Nevada Supreme Court cases we cited— that hold that the Nevada Stock Water Act did not give any rights in the land attended to the water rights that were addressed there. The issue that Judge Rader posed to me about whether there is any state law that would give the rights to use in the land as attended to a water right, that question was addressed in a seminal case by the Colorado Supreme Court of Cleary v. Schiffer. And in that case—and a lot of the other courts that have ruled on this question under the 1866 Mining Act have relied on that case. And in that case, a mill owner on public land tried to fend off the patenting, of the land on which the mill was located, by saying that they had obtained a water right that could be used only for that mill. And therefore, they had a right to use the mill at that location and land couldn't be patented. And the court said, no, that's wrong. You get the use to water by putting it to beneficial use on land, but you don't get the land. So there is no—and that case is no different, the result of that case is no different than any other state water law of appropriation that I'm aware of. And Colorado has cited it. But that helps this petitioner, does it not? Because he seeks to use the water for his purpose, not exclusively, but for his purpose. And is denied access to it. No, it's exactly—the case is supportive of our position. The mill owner was permitted to use the water for mill purposes. He just wasn't permitted to exclude others from that access. That case was not about what happened to the water right. It was about what happened to the land. But he could not have a mill there any longer. It is possible he could transfer that water right elsewhere, which is what we were talking about here, the question of whether the water right may be— that is a characteristic of state water law is that you often may have the option of being able to change the manner of place of use of the water right, which is an issue that has not been addressed in this case. Now on the wild horses and burros question, the wild horses— this court recognized in the Alvis case and in Fellini, although it didn't hold on the matter, but it recognized that the wild horses are not instrumentalities of the United States and the actions of wild horses do not constitute a taking by the United States. Was the Montezuma allotment leased to someone else or was it left open to whatever wild animals might choose to graze there? It is leased to someone else and wild horses and burros may also graze there as they may under the Wild Horses and Burros Act. The landowner there is required to truck water, although as long as that water is not being used— all water rights are only a use of fructured right. The fact that you're not using it doesn't mean you get to hoard it. Somebody else can use it if you're not using it. So if that landowner used the water, it wouldn't be a violation or a taking anyway. It certainly wouldn't be an act of the United States because we required him to truck the water. But I would note also that you only get a right to a certain amount of water. Each of the water rights they claim to have is for a certain number of cattle, a certain cubic feet per flow of cubic feet per second. So there may be water that's other water. It doesn't mean that nobody can go to the water's site and use the water. It depends on how much. Is this a natural pond or is this a well? I believe that they have a number—they allege they have a number of water rights constituting primarily, I believe, springs and wells spread out around the development. So these are tanks that the animals come to that are fed by a well? I believe it is something like that. Are there any lakes? I don't think—I really don't know, actually. We have not—it's not in their complaint. They did submit certificates that I have looked at, but I'm not that familiar from just what they have. I think one is described as a surface stream right. There's something like 31 there. I think I have touched on everything I had planned to cover. Okay. Thank you, Ms. Martin. Thank you very much. Thank you. Mr. Van Zandt. Thank you, Your Honor. On the breach of contract issue, first of all, the United States alleges that the complaint was filed in October 28th of 2003, which is not true. It was August 18th of 2003. That's very important because the final decision on the termination of the lease was made on July 24th. It wasn't final until 30 days later, so we were within the six years with regard to the termination of the lease. The range improvements issue, there's no procedure set out by the Secretary to allow for administrative procedure for filing a claim. It merely says that you present your claim. We presented our claim for the range improvements to the Secretary by way of filing the complaint. The property claims that Holden Cattle Company has here arise under federal law. I want to make that clear, not state law. We are looking at the Mining Act of 1866 and the way that Congress has dealt with the rights that were confirmed under that act as they were preserved in the Taylor Grazing Act and the Federal Land Policy Management Act. That's a very important point that I think is a distinction where you look to state law for the local law and custom to define what the right is, but ultimately the right arises under federal law. The United States has cited Hunter. Hunter was a squatter, and he didn't raise the same rights that we're talking about here, and Diamond Bar is also distinguishable because they were seeking exclusive use, and it was not a takings case. It was an administrative procedure set case. I think the background principles that we're talking about here, at the time of the appropriation of these water rights, you had to look to local law and custom. The local law and custom allowed for the use of the forage along with the water rights, and the United States poses that perhaps somehow we can get these water rights restored by applying for an easement at the site of the Port of Florida Rock and the situation there where the plant there was put in the position of having to apply time and time again for a permit to extract its minerals, and Judge Smith was the trial court judge on that. He said, you know, tell me what you're going to do with regard to those permits. Are they just going to be denied? And that most likely would be the result here. Colvin's attempts would be denied. We asked the court to reverse the trial court and send this back down for a full record. On the scant record that we have here, it's not appropriate to enroll in a motion for some objection. Thank you. Thank you, Mr. Van Zandt and Ms. Barton.